May it please the Court, Steve Thomas for the Plaintiff-Appellant National Union. Excuse me. We do need to concentrate on the argument in this case. That's fine. Thank you very much. This, ladies and gentlemen, is a property damage negligence case from Idaho with the District Court sitting in diversity, applying Idaho law, in which the summary judgment granted below is reviewed de novo on appeal. Plaintiff-Appellant National Union stands in the shoes of its insured, Fred Hibbard, who owned a Cessna 425 airplane destroyed in a November 2000 crash near Idaho Falls, Idaho. Respondent, NSI, Inc.'s company pilot, Scott Adams, was at the controls when the plane went down due to pilot error. The course and scope of pilot Adams' authority is the sole issue on appeal today. Appellant asks for reversal and remand for trial by jury because the District Court erred in three important ways. First, the District Court applied the wrong law, citing but then ignoring the pattern jury instruction on point, and also ignoring Idaho appellate authority requiring that the agent's conduct be, quote, purely personal, in no way connected to the employer's interest, to justify dismissal as a matter of law. Let me just ask you a question. Should Adams' failure to obtain approval before the flight just simply end the matter? Judge Nelson, I think not, because that funnels directly to the rule the court did reach out for, which is an unadopted restatement section 230, and even that particular restatement section provides that it is a factor to be considered. Under the restatement 230, just because something is prohibited is only a factor and does not dispose of the issue. And that is where I was headed. The District Court applied the wrong law in a second way by not only ignoring the pattern jury instruction and the court of appeals test of purely personal, the court chose a single-prong, single-factor test from the restatement of agency section 230, the Forbidden Act test. But Idaho never adopted that restatement section, let alone the comment. And as I said a moment ago, even that restatement section acknowledges that nominally forbidden acts may still be within the court's scope, depending on the circumstances. So I suggest that that was the wrong law for that second independent reason. Let's assume we agree with you. My question is whether we're simply stretching the scope of employment test too far by saying if he just agrees to go for a ride in somebody else's plane. Judge Nelson, I think that is a very good question and the kind of argument Mr. Elia might make in closing to the jury. But I think it's for the jury to decide. In this case, we don't think it's stretching at all. I commend to the court the unopposed declaration of Eric Riegler. Eric Riegler has over 35 years' experience with the FBI, the FAA, the NTSB. He taught at Embry-Riddle. He has impeccable credentials. He is unopposed and unchallenged. There's no gobbled chest. There's no other expert. His declaration explains why there are plenty of nexes or nexuses with the employment and the employer's interest. Remember, we have a brand-new asset sitting in the hangar of NSI. And if its pilot doesn't get the training and the dual-flight instruction time, he can't do his job. The asset can't be used. To me, it's a little analogous to a senior partner hiring an associate and saying, you got your license to practice? The answer is, you bet. I'm licensed to practice in Washington State. Well, three years later, let's assume you have a three-year, 50-hour CLE requirement. Three years later, it's December of year three and he hasn't got any time at all. He hasn't got any CLE credits. Is it reasonably incidental to his job as a lawyer to go out and get those CLE credits? Of course. He cannot practice legally. He cannot do his job come January 1 of year four if he doesn't get the continuing education credits. It's loosely analogous. Anyway, the third reason why we believe the district court erred is that it is something that's clearly forbidden under state and federal law. The district court made a credibility determination as a predicate to the Forbidden Act test. The district court took at face value the testimony of NSI President Waring that the training without approval in advance was prohibited. And yet, the same witness had given radically inconsistent testimony and deposition about the company's acquisition of the airplane, the 425. He denied it. And it wasn't until later, under a 30B6 deposition, we had to go 56F, we had to get more time, we issued a subpoena, we took the deposition of the insurance broker who, under the law, is the agent for its insured, NSI. And the broker's file showed that, sure enough, two days before this crash, the policy had been amended to add a new plane, the Cessna 425. And it recites in the insurance policy that Adams will be a pilot for this plane. But he's got to do two things first. He's got to go to Wichita, Kansas, for flight safety instruction. That's a week-long program. It costs about $5,000. And he's got to get 25 hours of dual flight instruction. And those were plenty of motive for him to see, hey, here's a freebie. Anyway, getting back, there was a credibility determination made taking at face value what the President said, even though that policy was never in writing, there's no evidence it was ever communicated to Mr. Adams. Mr. Thomas, he may be incredible. The witness, Mr. Waring, may have been incredible insofar as whether he had purchased the airplane. But that may bear only peripherally, and I suggest only peripherally, on the issue of whether his standard policy for the company was that you didn't get training without his approval. Those are two different things. And you want to create an issue of fact here, attacking his credibility just in and of itself. What evidence did you have that that wasn't his position? Before you get training? Well, I guess my thoughts. One is we cited the pattern jury instruction the Ninth Circuit approves about credibility. The jury, if it finds a person uncredible on one thing, may disregard any and all of his testimony. So that's part of my answer. That's a legal answer. The actual answer is that, in fact, the training had already been arranged for. According to the insurance company file, two days pre-accident, training had already been approved and reserved at this Flight Safety International Academy down in Wichita, Kansas. So it had already been decided by the company. Now, whether or not the President, Waring, knew about it or whether it was his executive assistant or his treasurer, who in the company authorized that, we don't know. But that's one answer. But your expert testified, I thought, that there was more than one type of training. Perhaps the type of training that he was to get at Wichita was different than the requirement that he have three takeoffs and three landings and 25 hours in dual. You don't establish with that policy that that was the training he was going to get at Wichita. Do you? I'm sorry, Your Honor. I'm having difficulty understanding the question. You are correct that there are two different types of training. Actually, three. There's the training from Flight Safety about the new type of aircraft, how this special 425 works. And that's done in Wichita. It takes about five days and about $5,000. Which is referred to in the documents that you're talking about. It is. And then the other type is an insurance-imposed requirement. You can't get coverage unless you have 25 hours of dual instruction flight time, meaning that you've got to have another person sitting in the cockpit, you've got dual controls on the airplane, who is fully qualified in that type of aircraft. And you've got to have 25 hours. And then the third piece is not so much training as the law, the Federal Aviation Regulation 61.57. You've got to have at least three takeoff and landings as the sole manipulator within the prior 90 days to continue to function and legally operate the aircraft. All of these things were necessary. And taking the flight which he did, Mr. Adams gained points, if you will, that qualified for the purposes of his doing his job with this new aircraft. What was the evidence about the FAA requirement and the dual and so forth? That wasn't, or correct me if I'm wrong, that wasn't among the documents that you found on the insurance forms, was it? Only that you had to comply with whatever the insurance company said you had to do. I think I can answer that. The FAR 61.57, no, that was not new. That was not found under the subpoena with the insurance broker's file. You're an expert witness, Testera, an expert. Yes. Brought that up, right. He did. But he also read the deposition in the file of the insurance broker, and it was there that we found confirmation that indeed the airplane had been bought. Remember, Waring denied under deposition that we'd bought this thing before. But in the insurance file, two days before this crash, the company's agent had received a request to insure this newly acquired airplane, the 425. And in it, it talks about who's going to be the pilot, it's going to be Adams, and he's got to do these two things first before he can fly and get insurance. Maybe I haven't answered. I'm sorry, I'll have to keep working on that question. But how does that bear on the rule that in order to get this experience or get this training, it may have had to have been specifically approved by Mr. Waring? Well, actually, I don't think it does. In fairness, if you really drill down on this rule, which I think was already satisfied by virtue of the fact that the company had reserved more training for this very gentleman, Mr. Adams, if you actually look at the guts of the rule, it's a financial rule. He wanted to control expenditures, and it's expensive. And his rule was, I don't want this company spending a bunch of money without my approval first. And it turns out that this opportunity was costing the company nothing. The other thing that's important to remember is that we have dueling policies here, both apparently oral policies of the company. One is this thing we hear about from Mr. Waring about pre-approval is required, but the other is a rule that he had to stay legal to fly. It's like the senior partner talking to the associate. You've got to get your COE credits, keep that license up. And that, to be construed broadly, means he had to do that which was reasonably necessary to do his job, which we submit includes getting training for this newly acquired aircraft, which includes dual flight instruction time. So there is a nexus, if you will, between why Adams would be flying with this qualified pilot, Jorgensen, in the other seat, who does qualify for dual flight instruction. He was doing something which helped his company realize on an asset. Remember, he was the only pilot for this company, and they didn't have a whole fleet of guys who could fly until he got qualified. So if the company was going to make use of this newly acquired asset through its company pilot over the last five or six, seven years, Mr. Adams, he needed training and he needed it fast. Let's go back. My last question of you is, you started out saying that Adams was at the controls. What evidence is there in the record that that's true? It's uncontested that he was at the controls. There were two pilots in the airplane. Both seats have full access to all controls. It's a dual flight aircraft. No question about that. Mr. Riggler explains that in his declaration. I only have a few more minutes before I need to pause. Well, both of the people now in the seats with access to the controls wouldn't be flying the plane at the same time. I mean, somebody had to be operating the controls that increases the speed and does whatever is necessary to take the airplane off. That was the subject of summary judgment motion number two, on which the district court denied it and said there's a question of fact, who was at the controls. That is also a subject to which Mr. Riggler, again, unopposed, highly qualified expert, takes an opinion and says that it is more probable than not, given the information before him, that it was the unexperienced pilot Adams who was indeed flying this plane when it crashed. That's pure speculation, isn't it, counsel? No, sir. With all due respect, I don't think so because, for one thing, it was previously appealed from and the trial court denied it, but that is not on appeal here today. For whatever reason, Mr. Eli's client did not appeal from that decision. And so that was reserved to the jury. And it's not speculation in the sense that we have a qualified expert who said that is true more probably than not, and there is no countervailing evidence in the record. But I can assure you that we went around at length on the second summary judgment motion, working through facts and law, wrestling with that conundrum because it was acknowledged. All right. Thanks. I'm sorry. I have a couple more minutes. I guess I'd like to say this. It's clear under the Idaho law, the rule of Podolin, that this agency question is one for the jury. There is a very narrow exception. When it is clearly outside the court's scope, then the judge may take it from the jury. I submit to this honorable court that there is no reason on this record to take this issue from the jury and follow the exception. There is every reason not to approve a district judge making an Erie V. Tompkins guess, sub silentio, he doesn't even go through the acknowledgement of this is what I'm doing, reaching out for a restatement section comment, which essentially elevates and trumps Podolin, Woolly Trust, Nelson v. Worldwide, Commercial Insurance v. Hartwell, all of these appellate decisions, including the one recently given to you by Mr. Elia's office, October 3rd, Feinholt v. Cresto. The court could not, should not, have made an Erie guess. The law is well settled in Idaho. He should have applied the pattern jury instruction and or some of these other appellate decisions I cite to the facts in the case and said, you know, let's see what the jury says. Thank you. Thank you, Mr. Thomas, Mr. Elia. May it please the court, counsel. My name is Michael Elia and I represent the defendant, NSI Inc. and Idaho Corporation. We're here to ask the court to affirm the district court's decision on summary judgment in this case. In framing the briefs for the court, there was a bit of a war, a fight as to what the issues were. Mr. Thomas' office framed them in one sense and I reframed them. I think the reply framed them one more time and in preparing for argument today, it occurred to me the issue is whether there's a reasonable inference from circumstantial evidence that Scott Adams was in the course and scope of his employment at the time of this accident. But, counsel, isn't the real question whether this is a question for the jury under Idaho law, the Podolon case, et cetera? It says this is a question for the jury. In general, that is true, Your Honor, unless it is clearly outside the scope and I think Idaho law supports that this fact scenario is clearly outside the scope of employment. Why is it so clear? Because there is no evidence in the record that Mr. Adams was motivated to try and get hours for this airplane. There just isn't any fact in the record to support that. There's innuendo, there's suggestion, but there isn't any fact. There's no witness that says Mr. Adams told me he was going to go fly with Mr. Jorgensen to get some hours in the 425. There's no communication to the radio tower that Mr. Adams is in control of the airplane. There's no communication with Mr. Uelschmid, the mechanic and pilot, that, oh, by the way, this would be Mr. Jorgensen, I'm taking Mr. Adams with me because he needs some training for this 425. This company had just bought the plane. Isn't it logical that he would want to get as much flying time as he possibly could? He may have, but I don't think we'll ever know that, and I think it's the plaintiff's burden to prove that. And there just isn't any fact to support that. That's our position on it, Judge. Do you concede that Mr. Adams was at the controls of this airplane? I do not, Judge. Counsel just said that that was a conceded fact. We don't consider it conceded at all. It was the subject of summary judgment motion. It was the second summary judgment motion that was brought. But that was denied, wasn't it, because there needed to be some additional discovery or something like that? Is that the second one? There's been three of them. There were three of them. The first one was on scope of employment, and that was denied to allow additional discovery. The second one was on the question as to whether Mr. Adams could be proven to be at the controls at the time and therefore the proximate cause of this accident. And that's the motion that Judge Windmill ruled against us on summary judgment, said that he thought there was a reasonable inference because of this potential motivation to get hours that Mr. Adams may have been at the controls. He did it in acknowledging that Mr. Jorgensen was doing the test flight, that Mr. Uelschmid asked Mr. Jorgensen to do the test flight, that Jorgensen was the pilot in charge, that there was no communication to the tower to suggest Adams was flying. And you haven't appealed that ruling? We did not, Judge. The issue on appeal for this was whether he was in the course of scope. And it's our view that it's one thing to make an inference that Mr. Adams is flying the plane. It's another thing to go that one step further and say, and that is in the course of scope of employment. You mentioned some of the direct evidence there is. Well, I take that back. I don't believe there's any direct evidence as to whether Mr. Adams was in the course of scope of his employment. The only evidence that's out there on that issue is circumstantial, and that evidence all points to Mr. Adams not being in the course of scope of employment. We pointed out in the briefing, in the appellate brief, he's an on-call employee. He was not an exclusive employee. When NSI needed him, they called him, and they wanted him to be available. He was not exclusive. He could fly for anybody else at any time, understanding that he had to be available when NSI needed him. Isn't that crucial? Because NSI just bought that plane, and he had to be available when they wanted him. Well, they bought the plane at the time that he is taking this flight, Your Honor. He can't fly it. He has to go through the training in Wichita that's already been scheduled for him in two to three weeks, but he can't physically fly that plane. Until he gets the hours in. The dual training hours, correct. So he did not need to be available for that plane. He couldn't take NSI anywhere in it. Takeoffs and landing were also, what, three, one of which he would have gotten here, right? In theory, if he's at the controls at the takeoff. NSI never called him. He was not on call at the time he took this flight. The evidence is that he is in Mr. Jorgensen's office. Mr. Will Smith comes in, says the plane is ready to test. Mr. Jorgensen says, come on, Scott, they're friends, and they went on the flight. I think the only reasonable inference from that is they're friends and they're pilots and they fly. And I don't know if there's any inference that can be made, any reasonable inference, that the real motivation here is for Jorgensen to teach Adams or for Adams to learn from Jorgensen. There just isn't any suggestion. When you line it all up, it seems fairly apparent the other direction, isn't it? I mean, he had flown previously with this same guy for training purposes. He had to make three takeoffs and landings. Here was a clear shot at doing that easily, one of them. He doesn't have to get approval because there's no expense involved. This is a freebie. And there's nothing unusual about his getting training from this particular guy. So couldn't you make a pretty good jury argument in reverse based upon the inferences from that, that he thought he was absolutely serving his employer's interest by advancing the ballgame of training? Our view is that you can make the argument, but there's no facts to support the argument. Well, but there often are not direct, there's not direct evidence of anything in almost every case. You started your argument off by saying this is a circumstantial evidence case. Sure it is. But you add all of it up. You may very well be correct, and the jury may buy it. But I'm just saying can't you, from the facts that we do know, can't you make a straight-faced argument that he was serving the interest of NSI by getting himself legal to fly the new plane that they bought and expected him to be able to fly as soon as it was safe and legal to do so? I don't know that it's a straight-faced argument, Judge. I think it's an argument. Okay. Well, then I'll smile and ask it. I think you need to know of a fact to make that inference. Okay. And plaintiff's counsel in their briefing, an argument today relies upon the expert testimony of Mr. Riggler. Judge, it's our view that you can't get a fact from expert testimony. It's by definition opinion. Well, both these versus Rexall resolve that question in this circuit about 23 years ago, something I painfully remember, because as I recall, I took the view you just said, and the circuit said, no, no, no, an expert declaration can indeed be sufficient to overcome a motion for summary judgment. Now, it may well be if you go to trial and you put on another expert and he shoots holes all through this declaration, it may be perfectly speculated, as Judge Beam suggests, to say that he was in the seat. Although, as I recall it, there's evidence that he wasn't communicating with the tower, and that's how come the expert came to the view that he did. But, I mean, for purposes of overcoming a motion for summary judgment, why can't you look at it? Mr. Riggler is an aviation expert. He testified in declaration about who was piloting the plane, and then he went on to say, and I think Adams was trying to get hours for NSI. There is nothing in Mr. Riggler's resume to suggest that he's an expert on Mr. Adams' motivation. No, of course. I'm not suggesting that. And that's the problem we're having. But there's some evidence. I mean, in his opinion, Adams was flying the plane. As I say, that may not stand up. But he did give a reason for that view. He gave a reason, and I believe that's why Judge Windmill decided against us on summary judgment in that motion. But then I think to use that same testimony to stretch it one step further to say, and he had motivation to get the hours, and that's why he took that flight. There's nothing there. He can't say that. Okay. He doesn't know. I agree with that. As to the restatement, we have these points. Idaho Supreme Court has certainly adopted restatement of Agency 228. But not the comment. But not the comment. Judge, are you referring to 228 or 230 on that? 228. Well, I know they've cited the test out of 228. And that was approved into best. Also commented and discussed in Portland in the Court of Appeals. Under 228, it's a dual test. There's a conjunctive part to determine what's in the scope of employment, and then there's a disjunctive part about what's not in the scope of employment. And it is our contention that clients have to meet their burden and prove every one of those points to be within the scope of employment, or if any one of those points is correct in our favor,  And I want to read to the court Part 2 of Section 228. Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master. So we think that word language, that is disjunctive language, and if any one of those tests fails, then plaintiff fails in their approval. And I'd argue to the court that Mr. Adams is far beyond the authorized time or space limits. He's an on-call employee. He wasn't on call. We hadn't called him. Mr. Waring, president of NSI, had no knowledge that he was on this flight. And I think importantly, and Judge Beam, you asked about this earlier, Mr. Waring, in deposition testimony, said that flight time, training time without approval was forbidden. And I think that goes right into this test, far beyond the authorized time or space limits. I don't think you can take Section 228 and ignore the remaining sections of health explaining. Section 229, which I did talk about in our reply brief or in our opposition brief, Section 230 was Judge Windmill considered, which was discussed at the hearing. The prohibition against that training helps elucidate that he is outside the scope. He's outside the time or space limits. Those were set by NSI, and that testimony is uncontroverted. There's nothing else in the record on that. There's innuendo that Mr. Waring's a poor historian. But no testimony, nothing from one of our employees, nothing from other pilots, that would suggest that that is not a true statement. I think that too little actuated by a purpose to serve the master is also applicable. Again, going back to what is in the record, and what are the facts by recipient witnesses who were there at the time. All we know is that Mr. Adams is accompanying Mr. Jorgensen to test the auto-feathering repair on a Cessna 425. We know they're friends, and we know they're pilots, and we know they like to fly. Thank you. Mr. Ryan? I did have one more comment, a couple more comments, Judge. Okay, sorry. That's okay. Just finding my notes again. Good try. I think the touchstone test that is commented on in DeBest, that is commented on in Portolan, is the right to control. And we don't believe that NSI had any right to control Mr. Adams' conduct on this day. And in trying to determine, trying to find an analogy, there's a lot of truckers on the road. Truck companies have hundreds of drivers. And if one of their drivers, who is required to have a CDL, who is required to maintain that CDL, decides he wants to do some driver tactic training with a friend of his on a weekend, and crashes into somebody, is that scope of employment, is that truck company responsible because the driver, on his own, without telling anybody, wants to improve his skills? He's a professional, and he has to maintain his skills. That's what he does as a professional, as to pilots, as to lawyers, as to doctors. But does that automatically put you in scope of employment? Or does it automatically raise the question, of course, scope of employment? We don't think there's an eerie guess to be made here. We think the Idaho Supreme Court has been very clear, and DeBest is a very good example of it. We had a plumber in his company truck doing plumbing after hours, and the court said, that is not court's scope of employment. Here, we don't have any of those indicia of employment. And we think this court can properly affirm the district court's grant of summary judgment. Thank you. Thank you. Mr. Thomas. May it please the court, I've got three minutes. Picking up where Mr. Eli left off, I beg to differ on how he reads the Wooley Trust case opposite DeBest plumbing. That case went to the jury. Course and scope was permitted to the jury in that question. The fight on appeal was whether or not the jury instruction given was a correct statement of the law. And that's a major difference. I invite the court to look at that, because the Wooley Trust case did indeed adopt and perpetuate the rule, unfortunately ignored by the district court, that it has to be a purely personal motive, unconnected in any way to the interests of the employer. The comments about control, I beg to disagree. That wasn't brief. That's not really part of this motion. That's a classic fight when it's an independent contractor. This is an employee, Mr. Waring so testified, and indeed even the district court relied upon authority that deals with and is premised in language of employer, employee, and employment. Mr. Wrigler's opinions are uncontested in terms of either a double challenge, there's none, there's no objection to his opinions, and there's no countervailing expert below saying Mr. Wrigler is wrong. I urge you to look at his declaration. His credentials are superb, and his opinions are there for you to consider. So let me close by saying this. I respectfully suggest that the Podolin rule from the Idaho Court of Appeals, that the scope of employment is a factual question to be decided by the jury, is the general rule in Idaho, and there's no reason to deviate from it here. The test ought to be at least edgy, 6.43.1, or preferably the Woolly Trust, purely personal, in no way connected with the employer's interest, and that is what the jury should be told when they decide the question. Now, last night was another baseball game, World Series, it's October, and as I watched, I remembered the old rule that in baseball, tie goes to the runner. And I thought to myself, hey, surely on this record, I got a tie, plaintiff should at least get a tie on this, the inferences should come my way, motion should be denied, and I should get to tell the jury. And then I thought, no, that's not right, Steve. A tie, expressed numerically, is 50-50. The law in Idaho is purely personal, in no way connected. Now, numerically, that's 0-100. That's a very high hurdle for Mr. Elias' client, and a very low one for mine. We may disagree in terms of the public policy, is that test reasonable? Hey, but that's the law of Idaho. It's a very low hurdle. All I've got to show is 1%, not 50, 1%. And I submit, I have done more than that. Finally, this is a sub salientio Erie V. Tompkins guess being exercised by the district court. If the court's going to do that, it ought to acknowledge it and talk about, this is what I'm doing, I'm predicting what the Idaho court would say. Judge did not do that below, and had he done so, I think it's fair to say that there would have been no guess. The Idaho court has been sufficiently detailed on this. There are at least six or seven appellate decisions in Idaho going through the test, and it's a jury question, time after time after time. So, to conclude, I have nine seconds. My client, yes, an insurance company, respectfully asks this court to allow us to present our case to a jury, which we truly demanded under Rule 58. There's another old sports rule. Thank you. Thank you, Mr. Thomas. Thank you, counsel. The matter just argued will be submitted and the court will stand in recess. Thank you.
judges: Nelson, Rymer, Beam